Filed 4/28/16  In re R.W. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re R.W., a Person Coming Under the Juvenile Court Law. | C077008 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.W.,<br><br>Defendant and Appellant. | (Super. Ct. No. 69952) |

In this proceeding under Welfare and Institutions Code section 602 (hereafter § 602; unless otherwise set forth, statutory references that follow are to the Welfare and Institutions Code), the juvenile court ordered R.W. detained in juvenile camp for one year after sustaining the fourth petition against minor R.W. and finding that he had repeatedly violated probation.  R.W. contends the court erred prejudicially by failing to obtain a

1

current social study report before making its order, and by failing to obtain an assessment under section 241.1 as to whether R.W. should be dealt with within the juvenile dependency system. If trial counsel forfeited these issues by not raising them in a timely manner or not obtaining a final ruling on them, R.W. contends counsel provided ineffective assistance. Lastly, R.W. contends the court erred prejudicially by finding that he possessed burglary tools because no true finding was made on that allegation and he did not admit it. Finding that any error was harmless and that counsel did not provide ineffective assistance, we affirm the judgment.

FACTS AND PROCEEDINGS

On June 12, 2013, the San Joaquin County District Attorney's Office filed a section 602 petition as to 14-year-old R.W., alleging one count of misdemeanor petty theft (Pen. Code, § 484, subd. (a)).

On July 19, 2013, the juvenile court ordered the matter continued so that R.W. could participate in a supervision program under section 654.2, placed him on informal probation for six months, and returned him to the custody of his mother, with his progress scheduled for review on January 17, 2014.

On October 21, 2013, the prosecutor filed a new section 602 petition alleging that R.W. exhibited an imitation firearm in a threatening manner, a misdemeanor (count 1; Pen. Code, § 417.4), and possessed less than 28.5 grams of marijuana, an infraction (count 2; Health & Saf. Code, § 11357, subd. (b)). On November 15, 2013, the juvenile court placed R.W. in the care of the probation officer and ordered him into the Electronic Monitoring Program (EMP).

On November 20, 2013, the prosecutor filed a new section 602 petition alleging three felonies: first degree burglary (count 1; Pen. Code, § 459), conspiracy to commit first degree burglary (count 2; Pen. Code, §§ 182, subd. (a)(1)/459), and receiving stolen

2

property (count 3; Pen. Code, § 496, subd. (a)).  On December 5, 2013, R.W. denied the allegations.  The juvenile court continued the setting of the jurisdictional hearing.

On December 19, 2013, the juvenile court vacated the section 654.2 review date of January 17, 2014, and extended the review period to February 4, 2014.

On December 27, 2013, the probation officer filed a request for an order to show cause (OSC), alleging that R.W. violated EMP by failing to attend school regularly and failing to follow the EMP contract or rules, as follows:  R.W. repeatedly went out of range, was absent from school for eight days from December 2 through December 11, 2013, admitted that he was hanging out with friends instead of going to school, and admitted using marijuana.

On January 7, 2014, the probation officer filed another request for an OSC, alleging that R.W. violated EMP by leaving his mother's house without permission and going out of range on December 31, 2013, going to stay at an aunt's house, and not returning home as of the date of the probation officer's request.

On January 9, 2014, at the hearing on the OSC request, R.W. did not appear.  The juvenile court issued a bench warrant, vacated the February 4 review date, and terminated EMP.

On January 27, 2014, the prosecutor filed a new section 602 petition, alleging three misdemeanors:  resisting, obstructing, or delaying a peace officer in the discharge of his duties (count 1; Pen. Code, § 148, subd. (a)(1)), possessing burglary tools (count 2; Pen. Code, § 466), and prowling (count 3; Pen. Code, § 647, subd. (h)).

On the same date, the probation officer filed a detention report, which stated that according to the police report R.W. and a "co-defendant" were seen ringing a doorbell at a residence where they did not live, and fled when a police officer contacted them; R.W., who had a bench warrant for his arrest, was detained and transported to Juvenile Hall. R.W. lived with his mother and stepfather.  R.W. and his family had two Child Protective

3

Service (CPS) referrals at unspecified dates concerning unspecified "general abuse and emotional abuse." The report recommended placement in Juvenile Hall.

At a hearing on January 28, 2014, the juvenile court observed that on December 19, 2013, it had rejected the probation department's request to detain R.W. "And guess what? They were right, and I was wrong. You never came back. You didn't come back for your interview, which was scheduled on January 8th, 2014. [¶] I think your mom reported you as running away or leaving on December 31st. There's two OSCs now with EMP violations alleged. [¶] So we haven't gotten very far down the road with you. For whatever reason, you've decided to ignore the Court. Here we are today, we have a bench warrant that we picked you up on. We'll recall the bench warrant, vacate the bench warrant review date of January 8th, 2015 for a year from now. [¶] We'll arraign you on the two OSCs. And . . . we'll arraign you on the new petition of January 27th, 2014 also. Then . . . we'll figure out where we are."

The juvenile court asked R.W.'s mother about his recent whereabouts. She stated that about five days after reporting his absence, she learned that he had been at her sister's house until January 16, 2014.

On January 30, 2014, counsel stated that R.W. had accepted an offer to plead to count 3 in the latest petition (felony receipt of stolen property), with all other petitions and OSCs to be dismissed in the interest of justice. The court found R.W. unsuitable for deferred entry of judgment and in need of formal probation. The parties stipulated that the police report relating to the November 20, 2013, petition contained a factual basis for R.W.'s plea. The probation officer stated that R.W. had had no "incidents" in Juvenile Hall. The court found that R.W. came within the court's jurisdiction, granted the prosecutor's motion to dismiss all other counts and petitions, and set a disposition hearing for February 14, 2014.

On February 13, 2014, the probation department filed a dispositional report. The report recommended a 60-day commitment to Juvenile Hall with 21 days' credit for time

4

served, 30 days on EMP following release, and an additional 60 days' commitment to Juvenile Hall, suspended pending successful completion of the department's Reconnect program. The report also recommended victim restitution, court-ordered counseling for R.W. and his parents, a substance abuse program, no-contact orders as to R.W.'s victims and criminal associates, and various other conditions of probation.

The report summarized the police reports on R.W.'s alleged offenses (including those dismissed pursuant to the plea agreement) and recounted the alleged probation violations as follows:

On January 25, 2013, while at school, R.W. stole shoes from Gabriel D.; he later gave them to a friend to post on eBay. The shoes were not recovered.

On September 29, 2013, Sary C., an apartment manager, reported that R.W., accompanied by another minor (J.K.), had brandished what appeared to be a firearm. After the minors were detained, the police found a BB gun hidden behind garbage cans, which the victim confirmed was what he saw. The victim stated that he had smelled marijuana in the laundry room of the apartment complex and found the two minors smoking there; when he ordered them to leave, R.W. lifted his sweatshirt and showed a gun in his waistband.

On October 27, 2013, officers responding to a report of two suspicious persons jumping into the backyard of a residence spotted R.W. and A.P. (also 14 years old) jumping over a fence and starting to walk away. After detaining the minors, officers found a backpack with a necklace hanging out of it near the fence; the back sliding glass door of the residence was open and the house appeared to have been ransacked. When searched, each minor proved to have a window punch in his pocket. A.P. stated that he and R.W., his cousin, decided to break into the residence and steal jewelry. The homeowner, Ernest G., stated that he was out of town when the incident occurred and had secured the house.

5

During the period from November 17, 2013 to December 13, 2013, R.W. repeatedly went out of range of his EMP monitor, had excessive absences from school, was failing most of his classes, admitted hanging out with his friends instead of attending school, and admitted using marijuana.

The minor's mother reported on January 1, 2014, that R.W. had left home the night before and was staying overnight at his cousin's house. Checking on the report the next day, the probation officer saw a person fitting R.W.'s description who looked out the window of the cousin's house but would not open the door. R.W. was again out of range of his EMP monitor during this period.

On January 25, 2014, officers responded to a residence where suspicious persons had been reported repeatedly ringing the doorbell. The officers saw two minors who matched the descriptions given. They said they were coming from a friend's house. Asked where they lived, they said, "Next door to our neighbors." One minor, later identified as R.W., appeared very nervous. Told to stop walking, the minors started to run. After apprehending them, the officers discovered R.W.'s outstanding bench warrant, transported him to Juvenile Hall, and booked him.

On January 29, 2014, the probation officer filed a third request for an OSC, alleging that R.W. was in violation of his EMP release due to his arrest on the bench warrant and additional charges, including possession of burglary tools, on January 25, 2014.

In summary, R.W.'s performance on informal probation and EMP release was "dismal at best."

Since R.W. was booked into Juvenile Hall on January 25, 2014, he had had two incidents for possession of contraband.

CPS reported two prior contacts regarding R.W. and his family. In December 2011, R.W.'s mother was accused of "general neglect" as to a different minor; the allegation was determined to be unfounded. In November 2011, R.W.'s stepfather was

6

accused of "emotional abuse" as to five victims, including R.W.; the allegation was "evaluated out."

R.W.'s mother had kidney problems and underwent dialysis three times a week. She was unemployed. She received $1,200 per month from SSI. She had no history of mental disturbance or substance abuse.

R.W. lived with his mother and stepfather and the six other children they had parented between them. The stepfather was not employed because he was helping to take care of mother and the children. Mother reported that her SSI payments barely covered their rent, which was $1,000 per month.

Prior to his latest booking into Juvenile Hall, R.W. had earned only five or six credits toward graduating from high school. He did not have a history of special education or IEPs.

R.W.'s drug of choice was marijuana, which he smoked about 10 times a day. He enjoyed being high and believed marijuana improved his thinking. He admitted occasional use of promethazine syrup to get high. He denied other illegal or controlled substance use.

R.W. denied involvement in any criminal street gang, but reported that some of his cousins were Crips.

R.W. was in good physical health and had no history of mental health issues. He believed bipolar disorder ran in the family. Mother reported that two of his cousins had bipolar disorder.

R.W. "greatly minimized his involvement and/or the impact that his behavior had on the victims" of the alleged offenses. As to the first incident, he said if he owned a pair of Air Jordans, he would take better care of them so they would not get stolen. As to the second incident, he said he and A.P. should not be held accountable for a residential burglary because they left the stolen property behind and the victim got it back.

7

R.W. wanted to stay out of trouble and to go back to school; however, he wanted to attend Cesar Chavez High School rather than the one he had been going to. He wanted release from custody. He did not need substance abuse counseling because he could quit on his own.

Probation referred R.W. to JJAT/Victor Community Support Services (VCSS) on November 15, 2013. A counselor at VCSS reported that R.W. and his mother had attended an intake appointment in December 2013, but missed appointments in January 2014. After mother told the counselor that R.W. would be returning to Juvenile Hall, the case was closed.

Mother feared R.W. was listening more to his cousins than to her. Her sister, the mother of A.P. (R.W.'s confederate in the alleged October 2013 burglary), raised her children more "liberally" than mother did, and even bought marijuana for her sons. Mother would like R.W. ordered to stay away from his cousins, especially A.P. She intended not to enroll R.W. in Cesar Chavez High School because A.P. was expected to go there.

R.W.'s case was referred to the Reconnect program on February 10, 2014. It appeared he was eligible for the program and would benefit from it. Mother approved of this plan because he would be able to get school and counseling at the same location, while supervised more intensively by probation.

In the probation officer's opinion, R.W. needed the services that would be provided on formal probation. He lacked remorse, had no apparent plan once released, would have difficulty staying out of trouble without serious interventions, lacked insight and minimized his behavior, and failed to appreciate the serious nature of his conduct.

In recommending the abovementioned disposition, the probation officer took into consideration R.W.'s age, the number of referrals on him, his lack of remorse, his poor school performance, his admitted daily use of marijuana, and the fact that his "PACT Assessment score was Moderate-High."

8

On February 14, 2014, the juvenile court committed R.W. to 90 days in Juvenile Hall with 21 days credit for time served, followed by 30 days on EMP, with another 60 days in Juvenile Hall suspended pending successful completion of the Reconnect program. The court declared that R.W.'s admitted offense was a felony with a maximum commitment time of three years. The court ordered victim restitution to four victims (Gabriel D., Ernest G., Sary C., and Tracy L., the victim named in the January 2014 petition) in amounts to be determined. (Subsequently, the probation officer reported that the victims had failed to respond to efforts to contact them and recommended awarding no restitution. The court ordered R.W. not to associate with A.P., D.K. (the other minor involved in the first incident), or anyone known by R.W. to be on probation or parole. In all other respects, the court essentially adopted the recommendations of the disposition report.

During the hearing, the prosecutor and R.W.'s counsel doubted whether further time in Juvenile Hall would correct his behavior. The prosecutor and R.W.'s mother suggested that commitment to camp might be more effective. The juvenile court stated: "We're going to do this now, and then if this doesn't work, that's always an option in the future. I hope this works, kind of shakes him up where he thinks it's better to comply with everything and get his life straightened out."

On March 25, 2014, a new section 602 petition was filed, alleging that R.W. had violated probation by committing burglary (Pen. Code, § 459). On December 11, 2013 (before the prior plea agreement and disposition order), R.W. and A.P. allegedly smashed a bedroom window at an adult care home and stole eight dollars. On March 20, 2014, R.W. was interviewed at Juvenile Hall and admitted the crime. The probation officer recommended an additional 30 days in Juvenile Hall.

At a hearing on March 25, 2014, the prosecutor asserted that R.W. had admitted "about 15 other burglaries" which his office had not known about when it made its prior plea offer. (No evidence as to these alleged burglaries is in the record; however, R.W.'s

9

counsel did not dispute the prosecutor's claim.)  R.W. admitted the probation violation. The juvenile court revoked and reinstated probation under the terms and conditions previously imposed, but with an order of 60 days on EMP.  The court also ordered R.W. to enroll in the Reconnect program as soon as possible.

On April 14, 2014, a new section 602 petition was filed, alleging that R.W. had violated probation from March 29, 2014, to April 10, 2014, by going out of range of his EMP monitor, arriving home late after school (which he was then attending under the Reconnect program), hanging out with friends and smoking marijuana, and testing positive for marijuana.  The petition recommended 60 days' detention in Juvenile Hall, 60 days on EMP following release, 60 days' detention suspended pending successful completion of the Reconnect program, and an order to complete a substance abuse program.

At a hearing on April 14, 2014, R.W.'s mother stated that EMP had not worked and would not work in the future.  R.W. had told her he was not going to stop smoking marijuana; if he finished a program, he would just go back to using afterward.  She reminded the juvenile court that she had other children at home and did dialysis three times a week.  She again suggested camp as an alternative disposition.

The juvenile court noted that the recommended disposition was "what we've already done."  The court then stated:  "Here's what I think, R[.]  I think if I follow these recommendations in the VOP, it's like your last best chance.  If you don't and can't comply with those conditions, then I think we might have, at least from mom, she would be pretty adamant about that camp would be the next step.  This is the last -- next-to-last step before camp.  [¶]  And R[.], you know that's a 360-day program.  This is a lot better than 360 days in the camp.  I thought we kind of made that clear the last time here in February when [the prosecutor] thought that the camp would be the best ticket right then and there, which maybe it would have been in retrospect or hindsight."

10

After R.W. admitted the violation, the juvenile court revoked and reinstated probation with the recommended terms and conditions.

On July 2, 2014, a new section 602 petition was filed, alleging the following violations of probation:

(1) R.W. went out of range on June 27 and June 28, 2014.

(2) R.W. had also been out of range on May 31, 2014, June 1, 2014, June 7, 2014, and June 13, 2014.

(3) R.W. left home without permission on June 30, 2014, and had not returned since then. Mother believed he was at the home of his cousin, A.P., whom the juvenile court had ordered him not to contact.

(4) On July 1, 2014, R.W. failed to attend the Reconnect program or to notify anyone of his absence.

(5) On the same date, a search conducted at A.P.'s home found R.W. there along with A.P. and A.P.'s brother, in a room that smelled strongly of marijuana. A search of R.W.'s person discovered that he was in possession of a window punch. After being Mirandized, he stated the burglary tool was in his left pocket; he also admitted to smoking marijuana before the officers arrived.

(6) R.W. tested positive for marijuana on April 3, 2014. He was referred to the county's Chemical Dependency Counseling Center on May 19, 2014. He tested positive again on May 22, 2014, and June 19, 2014.

In summary: "[R.W.] has been admonished/counseled numerous times to no avail. He continues to defy his rules of [p]robation by continuing to use marijuana, associating with minor[]s on [p]robation/A[.P.], being in possession of burglary tools, running away from home and failing to comply with his EMP rules/contract. This is [R.W.]'s third try on EMP, each time [R.W.] has failed."

At a hearing on July 2, 2014, R.W. denied the allegations. His counsel stated: "We need to get him interviewed. I know that [R.W.]'s mother is ill, and I think a lot of

11

what's happening here might be a function of the fact that she is sick enough where she might not be able to provide the appropriate supervision that's necessary.  I know she's going to dialysis three times a week, so she's not well.  [¶]  *And I'm wondering if a 241.1 might be appropriate.  I know there's some delinquent behavior, but I think there's also just nobody minding the store.*"  (Italics added.)  The juvenile court replied:  "[B]efore I make that decision, let's come back on Monday, July 7th for further juris.  We'll have it screened by then on a time-not-waived basis, denial is entered, and we can bring that up at that point too."  The court set the July 7 hearing date and ordered R.W. detained pending further court order.

At the July 7, 2014, hearing, the probation officer informed the juvenile court that the administrative screening had recommended camp.  R.W.'s counsel stated that R.W. was prepared to admit the probation violation, but contested the recommendation. Counsel did not renew the request for a section 241.1 assessment.

The juvenile court summarized the substance of R.W.'s admission as follows: "Then you do admit that you violated the terms and conditions of your probation by failing . . . to stay away from A[.P.]; by not successfully completing the Reconnect Program; by failing to remain at your residence at all times; except as approved the CSS officer and report all emergencies immediately [*sic*]; by failing the EMP Program; by using or possessing controlled substance; by failing to abide by all instructions with [*sic*] The Court[,] EMP officer and/or probation officer; and by failing to comply with all EMP conditions?"  The court did not mention R.W.'s alleged possession of burglary tools. R.W.'s counsel did not point out the omission.

After R.W. said "Yes," the juvenile court set a contested disposition hearing for July 16, 2014.

On July 16, 2014, the parties did not present new evidence.  The juvenile court stated at the outset:  "As you recall, the administrative screening, the people from the probation department recommended camp."

12

R.W.'s counsel asked the juvenile court to consider an alternative disposition of 180 days in Juvenile Hall, asserting that the recommended disposition was "an extremely high jump in what's being recommended for this child without really any analysis of how this is really going to benefit him." When the court asked if counsel had anything else to say, counsel said "No." The prosecutor concurred with the recommended disposition.

The juvenile court recited the history of the proceedings at length. In the course of doing so, the court stated: "You've been on EMP three times, you've failed all three times. You had incidents of running away, *having burglary tools*, hanging out with the wrong people." (Italics added.) R.W.'s counsel did not object to the court's statement about possessing burglary tools.

The court then revoked and reinstated probation with a commitment to San Joaquin County Camp for 360 days (minus 16 days' credit for time served), and with the following additional terms and conditions: "You fully complete all phases and components of the residential and after-care program of the San Joaquin County Camp; . . . you and your mom actively participate in the treatment program as required by the probation department; during the course of your residential and after-care commitment to the camp you undergo substance abuse testing as required by the probation officer." On completion of camp, R.W. was ordered to serve 30 days on EMP. The Reconnect requirement was deleted.

After the juvenile court finished making its findings and orders, R.W.'s counsel stated: "*I would just note for the record that this was done without a dispositional report and we never waived one.*" (Italics added.) Counsel subsequently stated: "Just need to put on the record that this was all done without the proper reports."

DISCUSSION

I

*The Juvenile Court's Failure to Obtain a Current Social Study Report*

*Before Making Its Disposition Order Was Harmless Error, and Trial Counsel's*

*Failure to Raise the Issue in a Timely Manner Was Not Ineffective Assistance*

R.W. contends the dispositional order should be reversed because the juvenile court failed to obtain a current social study report before making the order. If this court concludes the claim is forfeited because trial counsel failed to mention the juvenile court's omission until after the court made the order, then, according to R.W., he received ineffective assistance of counsel.

When making a sentencing decision under the juvenile court law, the court "shall consider the safety and protection of the public, the importance of redressing injuries to victims, and the best interests of the minor." (§ 202, subd. (d).) In determining disposition, "the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.)

"Under section 202, juvenile proceedings are primarily 'rehabilitative' (*id.*, subd. (b)), and punishment in the form of 'retribution' is disallowed (*id.*, subd. (e)). Within these bounds, the court has broad discretion to choose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public. (*Id.*, subd. (e).)" (*In re Eddie M.* (2003) 31 Cal.4th 480, 507 (*Eddie M.*).)

The juvenile court may commit a minor to the Division of Juvenile Facilities (DJF) of the Department of Corrections and Rehabilitation, the most restrictive disposition within the juvenile delinquency system, without previous resort to less restrictive placements. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) A fortiori,

14

the court may impose a disposition falling short of a DJF commitment, but still significantly more restrictive than a previous placement, without first exhausting all possible intermediate steps. (See *Eddie M., supra,* 31 Cal.4th at p. 507.)

"We review a juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision. [Citations.]" (*In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1320.)

Section 702 provides in part: "After hearing the evidence, the court shall make a finding, noted in the minutes of the court, whether or not the minor is a person described by Section . . . 602. . . . If the court finds that the minor is such a person, it shall make and enter its findings and order accordingly, and shall then proceed to hear evidence on the question of the proper disposition to be made of the minor. Prior to doing so, it may continue the hearing, if necessary, to receive the social study of the probation officer . . . ."

Section 280 provides in part: "It shall be the duty of the probation officer to prepare for . . . a hearing as provided by Section 702, a social study of the minor, containing such matters as may be relevant to a proper disposition of the case. The social study shall include a recommendation for the disposition of the case." (See also Cal. Rules of Court, rule 5.785(a); further references to "rules" are to the Cal. Rules of Court.)

Section 706 provides in part: "After finding that a minor is a person described in Section . . . 602, the court shall hear evidence on the question of the proper disposition to be made of the minor. The court shall receive in evidence the social study of the minor made by the probation officer and any other relevant and material evidence that may be offered . . . . In any judgment and order of disposition, the court shall state that the social study made by the probation officer has been read and that the social study and any statement has been considered by the court." (See also rule 5.785(b).)

Before reaching the merits, we note that R.W.'s complaint about the lack of a current social study is forfeited because R.W.'s counsel did not raise this point until after

15

the juvenile court entered its dispositional orders, despite many opportunities before July 16, 2014, and even during the dispositional hearing on that date, to point out that there had not been a new social study since February 2014. Notwithstanding counsel's belated assertion that R.W. had not "waived" his right to a new study, the court could reasonably have taken counsel's silence on this issue over the course of every hearing since February 2014 as an implied waiver of that right. Therefore, we address the issue only in light of R.W.'s claim that trial counsel was ineffective for failing to raise the issue in timely fashion.

We agree with R.W. that there could be no good tactical reason for counsel's omission. We conclude, nevertheless, that R.W. cannot show ineffective assistance of counsel because it is not reasonably likely he would have obtained a more favorable disposition if counsel had requested and obtained a current social study. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

Between February 2014 and July 2014, the court received three petitions alleging probation violations, all of which R.W. admitted. (In part III of the Discussion, we reject R.W.'s argument that he did not admit the allegation of possessing burglary tools.) The court also learned from R.W.'s statements in the probation reports how lightly he took his continuing misconduct and how little motivation he felt to change his ways -- in particular, his continuing use of marijuana and his continuing association with A.P., his cousin and associate in crime. In addition, the court had received an "administrative screening" recommending camp (although we cannot ascertain what new information, if any, this screening might have provided, since it is not in the record). Lastly, the court had repeatedly heard from R.W.'s mother in open court about what R.W. had done, what he thought about it, and what he intended to do if released from custody. Thus, the court had a comprehensive picture of R.W.'s actions and attitudes over the entire period since February 2014. Given the opportunity to offer new evidence at the contested disposition hearing, R.W. offered none.

R.W. asserts that there might have been evidence which could have changed the juvenile court's mind, had it been presented through a current social study. He cites "the stressors facing his family over the past five months [since the February study] that made it difficult for his mother to adequately supervise him and prevent him from associating with A.P."; his performance in Juvenile Hall during the times he was confined there between February and July 2014; and "concerns [noted in the February 2014 disposition report] that the stepfather had been emotionally abusive toward R.W. in the past." We are not persuaded.

The juvenile court was well aware of the family's situation, including the mother's health, both from information contained in the February social study and from statements made by the mother and R.W.'s counsel in open court. The "concerns" about the stepfather stemmed from a single allegation, described in the February social study, that he might have been emotionally abusive in *2011,* two years before this proceeding began; nothing in the record suggests that the allegation was found true or that there had been any such conduct since then. And even if R.W. remained free of discipline in Juvenile Hall, that fact could not have outweighed his repeated violations of probation every time he was released, or his refusal to consider changing his ways.

The juvenile court made plain to R.W. every time he appeared that a significantly stricter disposition was facing him if he did not show any signs of change. Counsel for both parties and R.W.'s mother all agreed that further short stints in Juvenile Hall were unlikely to accomplish anything. R.W.'s mother suggested camp -- the option the court finally chose -- as the only thing that might turn him around. Under all the circumstances, a current social study would have been extremely unlikely to alter the picture in R.W.'s favor. Therefore, the court's failure to obtain such a study was harmless error. (See *In re Melvin J.* (2000) 81 Cal.App.4th 742, 744-745 (*Melvin J.*), disapproved on another point in *John L. v. Superior Court* (2004) 33 Cal.4th 158, 181, fn. 7.)

R.W. relies on *In re Deon W.* (1998) 64 Cal.App.4th 143 (*Deon W.*), *In re L.S.* (1990) 220 Cal.App.3d 1100 (*L.S.*), and *In re Devin J.* (1984) 155 Cal.App.3d 1096 (*Devin J.*), which held that the failure to obtain a current social study before disposition required reversal. These cases are procedurally and factually distinguishable.

In *Deon W.,* the juvenile court refused the minor's request for a contested disposition hearing, and no social study was ever prepared. (64 Cal.App.4th at pp. 146-147.) In *L.S.*, similarly, the juvenile court made its dispositional orders at the original disposition hearing without ever receiving a social study. (220 Cal.App.3d at pp. 1102-1103.) In *Devin J.*, a social study was prepared, but only to determine whether the minor was a fit subject for juvenile court, not to determine what treatment might help the minor; based only on that information and a recommended disposition, and apparently without considering any less stringent option, the court imposed 12 years six months in the former California Youth Authority. (155 Cal.App.3d at pp. 1098-1101.) Thus, in all three cases, the juvenile court proceeded without the assistance the social study is meant to provide, and also without benefit of extended observation of the minor or information obtained from other sources which might have compensated for the lack of a current social study. (Compare *Melvin J., supra*, 81 Cal.App.4th at pp. 744-745.) In our case, by contrast, the juvenile court had abundant information from the sources we have enumerated above -- all consistent with the findings of the February 2014 social study. On this record, it is not reasonably likely that a new social study would have provided grounds to support a more lenient disposition.

R.W. has shown no grounds for reversal based on the lack of a current social study.

II

*R.W.'s Section 241.1 Claim of Error is Forfeited, and Lacks Merit in*

*Any Event*

R.W. contends the dispositional orders should be reversed because the juvenile court failed to assess whether his case should be transferred to the jurisdiction of the dependency court under section 241.1, despite counsel's request for such assessment. We conclude the issue is forfeited because counsel failed to renew the request and obtain a ruling on it after the court deferred it to a subsequent hearing. We conclude further that R.W. cannot show ineffective assistance of counsel on this issue because counsel might have had a plausible tactical reason for not pursuing the issue and because R.W. has not shown that a section 241.1 request had any chance of success on these facts.

"Whenever a minor appears to come within the description of both Section 300 and Section 601 or 602, the county probation department and the child welfare services department shall, pursuant to a jointly developed written protocol described in subdivision (b), initially determine which status will serve the best interests of the minor and the protection of society. The recommendations of both departments shall be presented to the juvenile court with the petition that is filed on behalf of the minor, and the court shall determine which status is appropriate for the minor." (§ 241.1, subd. (a).)

The assessment must consider at least the following factors: the nature of the referral; the minor's age; the minor's parents' prior records for child abuse; the minor's prior record for out of control or delinquent behavior; the parents' cooperation with the minor's school; the minor's functioning at school; the nature of the minor's home environment; and the records of other agencies involved with the minor and the family. (§ 241.1, subd. (b); *In re M.V.* (2014) 225 Cal.App.4th 1495, 1506 (*M.V.*).)

"[T]he fact that section 241.1 imposes a 'mandatory' statutory duty does not preclude the application of the forfeiture rule. (See § 241.1, subd. (a) [§ 241.1

19

recommendations 'shall be presented to the juvenile court with the petition']; see also § 15 ['shall' is mandatory].) Rather, courts have repeatedly held that a party's failure to object forfeits appellate review of . . . the failure to prepare [] mandatory assessment reports in juvenile proceedings. [Citations.] Indeed, '[a]s some of these courts have noted, any other rule would permit a party to trifle with the courts. The party could deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable.' [Citation.]" (*M.V., supra*, 225 Cal.App.4th at pp. 1508-1509.)

Here, trial counsel did not take up the juvenile court's invitation to renew the section 241.1 request at the dispositional hearing. Instead, counsel acquiesced in the court's continuing exercise of jurisdiction under section 602. Counsel's acquiescence forfeits the issue on appeal.

When the record does not show why counsel acted as he or she did, and it is possible that counsel had a colorable tactical reason for doing so, we cannot find that counsel was ineffective. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Here, counsel might reasonably have concluded that since R.W.'s "prior record . . . for out-of-control or delinquent behavior" and "functioning at school" (*M.V., supra*, 225 Cal.App.4th at p. 1506) were dismal and there had never been a substantiated CPS referral as to the minor's mother or stepfather, it would be futile to seek a section 241.1 assessment.

In R.W.'s reply brief, he asserts: "[A]s trial counsel noted, much of R.W.'s behavior was due to the fact that his mother was so ill that she could not adequately supervise him . . ., and such neglect, if it presents a substantial risk of harm to the minor, serves as basis for dependency jurisdiction under section 300, subdivision (b)." But bare assertions of counsel, even if improperly characterized by the use of the verb "noted," are not evidence, and the actual evidence in the record makes clear that R.W.'s criminal offenses and probation violations were not "due to" anything but his own choices.

In any event, R.W. has cited no authority tending to show that on these facts a section 241.1 assessment would have stood any chance of getting the case transferred to the jurisdiction of the dependency court, or even subjected to dual jurisdiction under sections 300 and 602. Thus, R.W. has failed to show that he was prejudiced.

III

*R.W. Has Forfeited the Contention That He Did Not Admit Possessing Burglary Tools; In Any Event, R.W. Has Not Shown Grounds for Reversal On This Issue*

R.W. contends that in making its dispositional order the juvenile court erroneously relied in part on the allegation that he possessed burglary tools. According to R.W., there was no true finding on that allegation because he did not personally admit it, and without that admission there was no reliable evidence to support the allegation. Therefore, according to R.W., the dispositional order must be reversed. This issue is arguably forfeited because it was not raised below. But even if not forfeited, it lacks merit.

The petition filed July 2, 2014 alleged, among many other violations of probation, that R.W. was found by law enforcement to be in possession of a burglary tool, a window punch, on July 1, 2014, and that after being Mirandized he admitted the tool was in his left pocket. On July 7, 2014, R.W.'s counsel stated that R.W. was prepared to admit "the violation of probation," and did *not* state that R.W. wished to deny or dispute any specific alleged violation. When the juvenile court, in reciting the allegations and obtaining R.W.'s personal admission as to them, inadvertently omitted the allegation of possessing burglary tools, counsel did not point out the omission. When the court stated at the disposition hearing that R.W.'s list of offenses and probation violations included "having burglary tools," counsel did not object. In short, neither R.W. nor his counsel ever claimed below that he did not admit the allegation of possessing burglary tools, which was encompassed within the violation of probation he admitted, despite numerous

21

opportunities to make that claim.  He may not do so for the first time on appeal.  (See *M.V., supra*, 225 Cal.App.4th at pp. 1508-1509.)

But even if this issue is properly before us, it affords no basis for reversal of the dispositional order.  As the juvenile court stated at length, R.W.'s entire course of conduct since this proceeding began showed his failure to rehabilitate and his determination to keep doing what he had been doing all along.  Under the circumstances, the court was well within its discretion to find that that course of conduct, and the failure of the less restrictive dispositions that had been tried so far to rehabilitate R.W., required the more restrictive disposition the court imposed, regardless of whether his possession of burglary tools on July 1, 2014, had been proved or admitted.

DISPOSITION

The dispositional order is affirmed.


                                               HULL                , Acting P. J.



We concur:



        MURRAY      , J.



        RENNER      , J.